We're very pleased to be here today at Emory Law School. As I hope you all know, we are a national court, unlike the 12 regional circuits, and our legislative history encourages us to sit around the country. So once a year we do. I think we were here perhaps around 10 years ago in Atlanta, and we're very happy to be here again. Many people think of us as a patent court. We are not a patent court. We are the patent court, in the sense that all appeals from around the country come to us, but that's not all we hear. And this morning's calendar illustrates that very well. About 40% of our cases are patent appeals, and perhaps half are argued cases. This morning, out of five on the calendar, only one is a patent case. We have two government employee cases from the Merit Systems Protection Board. Only one is being argued. The other, the pro se, is submitted on the briefs. We have a contract case from the Court of Federal Claims, a bid protest case, and we have a veterans case from the Court of Appeals for Veterans Claims that also will not be argued. So we have three argued cases. First case is Centillion Data v. Quest Communications, 2010, 1110, and 1131. Mr. Wigner. Thank you. May it please the Court. The fundamental error made by the district court in this case was to construe the system claims of patents, not just the method claims, but the system claims as well, as being divided or distributed. In other words, as requiring action by multiple entities in order to infringe under the use prong of the statute. Based on that view of the claims, the Court then undertook an infringement analysis using a joint infringement framework and applied the standards of PMC and Muni Auction to find non-infringement. Mr. Wigner, do you agree with the statement in the NTP case that a system is used when the system as a whole is put into service? Yes, absolutely, Your Honor. And in this case, who is it that puts into service the system as a whole as set forth in claim one? It's our position, Your Honor, that Quest puts the system into service because it controls the way the system operates. From beginning to end, Quest is in complete control of the system, the patented system. But Quest does not put into service the operation of the individual personal computers, correct? That's correct, Your Honor. Quest does not operate the computers themselves, but the system claims do not require operation of the computers. They simply require a means for transferring the records to PCs that are adapted to perform additional processing. The last part of the claim says, referring to the personal computer, talks about it presenting a subset of the selected records, including set exact charges, actually billed to said user. It sounds like that would be an implementation on a personal computer, correct? Your Honor, that describes the software that's installed on the computer. It's the client application that adapts the computer for additional processing. The claim language, and I think this is where the district court went wrong, and this is page 32 and 33 of the amended order, which appears at page 288 of the joint appendix. The district court interpreted the language adapted to perform additional processing to mean that the customer executes the application to actually perform additional processing, that is, to manipulate the data that's transferred to it. That's why I began by saying these claims are not divided claims. They are unitary claims. Well, that does sound like a method step, but in terms of the system, is the personal computer not a part of the system? The personal computer is part of the system, but in determining what constitutes use of that system, I think the court has to look at what is claimed. And what is claimed is a unitary claim that focuses, as suggested in the BMC case, that focuses on one part of the system. And that's the so-called back end of the system that directly controls the data processing means, the storage means, and means for transferring data to PCs. The PCs are merely set forth in the claims as a passive limitation. Well, a passive limitation, but the claims require the PC to be capable of being used to sort through these summary records and to rearrange the records at the customer's desire. So how is that not part of the system? Well, there's no active – well, Your Honor, as I was answering Judge Lynn's question, the PC is part of the system, but in determining what constitutes use of that system, you have to look at the claim language itself. The key language here is adapted to perform, and the district court construed that to mean the customers execute the application. Adaption is merely installation of the software on the PCs. Execution is the running of the program. Well, even if I were to accept that adaption is installation of the software, Quest isn't doing that either. Quest isn't installing the software, and that was how you just now defined what that language should mean. That's correct. Whoever installs the software, whether it's Quest or the customer is on the Quest direction, the installation of the software merely integrates the various components. That's part of the making of the system. And we want to make clear that we're distinguishing use of the system from making of the system. So even if installation constitutes part of the making, the use is a separate issue. And Quest uses the system from beginning to end. Okay, Quest. Suppose that I am Nintendo or some hipper, younger version, okay? Sorry, Nintendo. But I'm making video games, arcade games, the ginormous kind with the joystick controllers. I'm dating myself. But I make this, and I make it available, and you come use it. Well, I may have made it under the patent code, but aren't you the person using it, even though you're using my arcade game? You don't own it. You're coming to my house to use it. Aren't you the user? Well, the customers may be users as well, depending on how broadly the court wishes to define the term use. And going back almost 100 years, the Supreme Court decision in Bauer versus O'Donnell, use has been defined very broadly as a comprehensive term and is determined on a case-by-case basis. So, yes, the ultimate customers can be using it. But Quest is really using it as well. And if the definition of use is put into service, I think it's Quest as a party that puts it into service. I find that last part a little difficult, though, because I'm making the video game available to you. You're the user. I can't also be the user just because I make something available to you. Suppose, for example, no one ever used the Quest service. They built all the components, but no customer ever once subscribed. It was a failing process. No one subscribed. No one ever downloaded the software. No one ever used it. Would there be a user in that case? No, I don't think there would be. But here, Quest downloads, sends information to its customers. They process the data through the system. And so they're putting it into service. They're making the service— Oh, but wait. Quest sends information to customers, but it happens for Quest. Well, the customers would request the information. The customers have to subscribe. The customers, then, in the on-demand capacity, the information is sent and compiled directly in response immediately in time to their request. Yes. Well, again, this is a system claim, not a method claim, so there's no temporal component to the claim. It doesn't matter what happens when. The question is, what constitutes the use of this system? And Quest, as I said, controls the system from beginning to end. They enlist subscribers. They help the subscribers set up the accounts. They provide— But Quest doesn't know and doesn't control whether the front end is used. They don't control the customers, but they control the system. They control the software. In fact, this very issue came up— But we're talking about use of the system, one of the components of which is the front end. This very issue came up in the Fantasy Sports case. In that case, the court held that the SportsLine was subject to liability for direct infringement because it maintained and controlled the software, despite the fact that the customers actually operated the software by going online and accessing the server on SportsLine's—over the Internet, on SportsLine's server. Here, the software was on the client's side, on the PC. They simply moved it to the client's side, but that's a distinction without a difference. But again, if the standard is that the system, as claimed, is used where the system as a whole is put into service, then the question still remains, at least in my mind, as to whether it is Quest that puts into service that system, including the personal computer, or whether it's the end user that puts the system into service, or whether neither really puts it into service, each one—each Quest and the end user each using part of the system. Your Honor, the customers can't do anything without Quest's authorization. Quest processes the data. They provide the client application to the customer. They authorize the customer to use the client application. It's licensed. Even when the client—when the customers obtain third-party client applications from third-party vendors, Quest still has to provide the schema that allows the— But how is that any different than me giving you access to my video game? Quest gives them access to a system, which maybe it made, but it's not using the system until the customer makes its requests. The customer makes a request. The customer has to subscribe. But once that subscription takes place, once the customer downloads the client application, accepts the license agreement, after that, it's—they can't do anything without the data. It's Quest that's processing the data and controlling—they own the data. They process the data. But you can't play the video game unless I let you. I own it. I've got it in my house. Why isn't it any different than that? They're just leasing out their equipment to be run and operated in accordance with your subscription. Well, I think the difference here is, Your Honor, is that the client application is specifically intended to process the data that's being forwarded to that—to the customer by Quest. And I'd say I'm into my rebuttal time here. You can finish your concept and we'll save the rest for you. Thank you, Your Honor. I think the—what the court should look at here is the processing of the data. That's what a system does. It processes information, data, material, energy. Something goes through the system. And Quest controls the flow of that information through the system. Yes, the customers have to subscribe. Yes, they have to have the client application installed. But once they do that, everything after that is under the control. Everything in the patented claim—again, the patented claim requires only a PC that is adapted to perform additional processing. If you have a hypothetical claim—and see if you can follow this—a claim that reads something like this. That's a very good claim. Thank you. Thank you. Is it patentable? Is it a patentable claim? It passes 112th muster. So my question is, if I purchase one of these cars and I drive the car from place to place, am I putting into place that system? Well, you're getting beneficial use of the system. No, but that's a different question. So my question is, am I putting into service that system, including the paint shop, the assembly line, the distribution network? Well, I think if you look at DECA, DECA I think answers that question. In DECA, the court held, the court of claims held, that navigators on warships and planes that download information from the transmitter in Norway were using that transmitter. So in that sense, they're using everything that's upstream of where they are. Well, in my hypothetical, let's suppose the day after I buy my car, the auto company goes out of business. Am I still using that system as a whole? Well, I don't— The system that no longer exists in part? Well, Your Honor, I think that's a good question and it's sort of esoteric. I don't think— Well, we're good at esoteric questions. I think it would be difficult to say that the customers are putting the system into service. I think the most you could say there is they're getting beneficial use. And it's the same situation would be here if Quest went out of business, for example, and the customers still continued to process their old phone bills on their personal computers for a while. Well, they were getting beneficial use of it. I'm not sure you could say under those circumstances they're putting the system into service. It's like a customer that goes to an ATM machine and puts his card in the machine and gets money out. Is he putting that system into service? In one sense, he is, but it's really the bank that creates the software systems, puts the money in, creates the whole network that puts the system into service, makes the money available at the ATM machine for the customer to obtain it. Mr. Wigman, we'll give you back your full five minutes. Thank you very much, Your Honor. Mr. Belusco, you're defending your win below on non-infringement and also you have a cross-appeal on validity. May it please the Court. First question is their use of what and making what? Quest has been accused of direct infringement. Well, they never make— Well, Quest has also been accused of indirect infringement, as I understood the complaint. Is that correct? That's true, and I'll address that, Your Honor. But let's start with the direct infringement. They've been accused of making and using the claim invention. That's the whole thing. First off, there's no evidence that each and every element of this claim has ever been assembled by anyone, any group of people. There is no evidence that each and every element has ever been assembled. But specifically as to Quest, as already pointed out by this Court, Quest doesn't provide PCs or load client application software on a PC. Similarly, they don't specify the character, select or make specific the character of what's supposed to be in a preprocessed summary report. That's something that only the user does, the customer does. So Quest never has the whole system. They can't use the whole system because it never exists when they have it. They don't make the whole system. This is very much like the Cross Medical case in that sense. In Cross Medical, of course, Medtronic was accused of, with an apparatus, of infringing a claim that this Court construed as requiring an anchor seat to be in contact with Bono. Well, of course, that could only have been done by the surgeon in that particular instance. The Medtronic could not be, as the Court found, either a direct infringer for making or using that entire apparatus. Cross is also very relevant with respect to the language of that claim because it had the term operatively joined, which this Court construed as it's actually got to be contacting. And that's very analogous to as specified by the user here. Why don't we turn to the customer, if you don't mind? Why is the customer not a user? Well, the customer isn't really using the entire system either. What about on-demand? Let's just focus on the on-demand aspect. The customer makes a specific request, a request that, as I understand it, processes, retrieves the data that is requested, sends it to the customer, that in theory the customer would then use the software to manipulate the field, organize it chronologically or alphabetically or however it is they want to, assuming those facts. Before you tell me those aren't the facts of our case, assuming those facts, why isn't that customer the user? Well, let's start with that request. The request is a request that Quest do some back-end operations. Quest does those back-end operations and then posts an email that the information is ready to download. So it isn't an instantaneous thing in any way. That's how it works. Next off, one need not have the Quest application software on their computer, the client application software. I understand, but what I'm saying to you is assume they do, assume they have the software, they make the request, they manipulate the data, why aren't they using the entire system at that point? If we assume that they are, first off, that they're using the entire system, I don't think they're using the back-end. All they are doing is requesting that Quest provide information. Would Quest be providing that information but for their request? No. Okay, so they are, why aren't they putting that system into operation? Well, then, the issue of, well, as specified by the user, there has to be a specific request. In the on-demand case, and that's why I'm learning, in the on-demand case, I feel like that is your hardest hurdle to overcome. Right. So, when the user is making a specific request, as in the on-demand case, specified by the user, Quest is then performing those functions, why isn't that customer use? If that's the worst case, that is indeed a hypothetical. Don't you think that's your worst case? Okay, I'll assume that. I agree. That's the worst case. That's a hypothetical case. There's no evidence in this record that that's ever existed. Once again, we get to ask hypotheticals sometimes. Right, I understand. So, go ahead, tell me. I know you think the evidence is deficient to establish that. Right. But, assuming that I don't agree with you on that point, isn't there customer use of the entire system at that point? Well, I guess that comes to how we define use. Are we using it in the sense of a beneficial use of a component of the system, or does it have to be of the entire system? It isn't an answer to Judge Moore's question. The fact that the user is simply obtaining data, which it can process on a personal computer, and it doesn't really care how that data was generated, what steps, what system, what apparatus was used to provide that information. So, that the request for data doesn't necessarily put into service the various back-end steps that are listed in the claim simply because a request is made for the data. Well, that's certainly the case, though. From the customer's perspective, all they care about is getting data. They don't, you know, the back-end to them is quite irrelevant. They're not putting into service that processing operation because they don't care how that data is generated. That's up to Quest. That is correct. Okay, so you're adopting the judgment answer? Yes, I am. Okay, well then let me ask you a follow-up then. My Nintendo computer system, my claim is to all the components on the inside. Guess what? As the customer, I don't care for two seconds whether this thing connects to that thing, connects to that thing, drives this processor, and nor am I, does it matter to me how it's done? But aren't I nonetheless using it even if I am not controlling how it is occurring on the inside of that box? But I'm still the one using the video game. You're using the video game because it's all there. You have all the components there. So, is there a physical proximity requirement now that you would like to import into our use law? Well, I think with the system claims, that certainly has to be considered because you're amalgamating disparate physical things used at different times by different people to say now, that's a system. But it's not a system used by a single party. Following up on that, does the concept of control have any relevance in your argument that neither party controls the other? Absolutely the case. Neither party does control the other. For example, as admitted in the statement of undisputed facts, the customer, when they ask to get monthly data, they don't direct or control the steps of how it's stored or how it's transferred in the backend. But when I have my video game and I'm moving the joystick, I don't control what's going on inside the box. So, yet it nonetheless happens. No, because there you have the whole box. What if I move the box next door? So now I've got a really long wire. The box is not physically in front of me. Or better yet, I RF it over. And so now it's going by wave. It's not even physically. Well, what you're directing or controlling, though, is the entire apparatus. Here, all the customer ever directs or controls is a request for certain data. Nothing about how the backend will process that data in any way. Okay, but now my video game, I seem to think that you accept that I'm the user in the video game. The customer is the user for infringement purposes. Now it's an online video game. Well, with an online video game, the box isn't with me. The box isn't next door. The box is controlled by an online server that is providing me access to the game. Am I still using it or is that different? I still think it's different because what you're doing is you're controlling, with those joysticks and everything, everything that's happening in the backend of that video game in the server. Every step of that operation. Why aren't your users controlling? They are causing you to generate the data and send it to them. They're asking just for data. They in no way control how that data is prepared, what methods or apparatus Quest chooses to prepare it on or anything else. Well, I don't care what the server's doing with the video game. I just care if my guy's killing the other guy on screen. But under your example, each and every element of that claim would be controlled by the user. That is not the case here where we, in effect, don't have something that's one thing in control of another, but rather a request for data that all that you get is later data. You don't go in there and, oh, I make a request for data and I'm going in now and controlling that software of Quest to do something. Mr. Belusco, I'd like to ask you about your cross appeal. Yes. The question of Cobra trace anticipating the claims. The trial court said the Cobra subscription request is merely an extension of the pre-Cobra system. Why is that relevant? Because if the pre-Cobra system anticipated, then what difference does it make that this was simply an extension? And if it didn't, how does this make it not an anticipation? I don't think that it's relevant what the pre-Cobra system had or not. Wasn't that the premise of the district court's decision? Yes. But I don't think it's relevant because I believe that the district court looked at that as you therefore did not, as specified by the user, select or make specific the content of the report you wanted because you had already done it. Of course, factually, the record shows that with the new Cobra trace system, you had to make such a selection as part of your analysis anyway, your subscription. So I think that factually, the facts show that such a selection was made separately, but it wouldn't matter because in any event, it would be made as specified by the user at one point, even under the scenario that it was done early. If we agree with Chief Judge McKinney on the infringement side of this case, do we need to reach the validity question? I don't believe so, Your Honor. Is there a cross – I'm sorry, a counterclaim of invalidity filed or was validity simply asserted as an affirmative defense? There is a – there was a DJ action filed. So invalidity was there. But in order to perfect this for an appeal, as you may have seen, there was a second order from the court, an amended order, and he dismissed without prejudice those claims so that they could be re-raised if we felt they needed to be because some of the validity issues were not resolved on this summary judgment. Well, he denied a motion for invalidity – a motion for summary judgment of invalidity. He denied a summary judgment on the 112 issue, and he indicated there was a genuine dispute of fact. That was not part of the order here. The order here was compliant to anticipation of 112. He granted the summary judgment of no anticipation, right? That is correct. And as I understand your argument, it is when the customer selects toll calls, that is, the summary report is specified by the user, and you think at least that's a question of fact for the jury? Right. That's meeting that active limitation that is specified by the user. All right. We'll give you your two minutes back for rebuttal on your cross appeal if there's something to rebut. And we'll hear from Mr. Wagner with five minutes. Thank you, Your Honor. I'd like to return to the question about who is the user. And as we presented our arguments in our appeal brief, we believe that both Quest and the customers are users. And, of course, in a situation where customers are the users, Quest is an indirect infringer. Our position with respect to the customers is really based on the court's decisions in DECA and NTP, NTP in particular, where the BlackBerry customers send a message on their BlackBerry system. The signal is transmitted through various relays, one of which was in Canada, and the court held that the BlackBerry customers were, in fact, using those various components, even though they didn't control them directly. And that's basically what the customers are doing here. The same situation occurs in DECA, which I mentioned previously, where the navigators receive signals from the transmitter in Norway, so that DECA and NTP are sort of the opposite sides of the same coin. One case is receiving, the other side is transmitting. If counsel is correct as to his definition of use, then I think that calls into question the court's decision in DECA and NTP, and at least, I think, calls into question the, really undermines the whole jurisdictional framework of those decisions. And the only way to rationalize it is to say it is one definition of use for jurisdiction and another definition of use for the infringing act. And with all respect, I think that is intellectually dishonest. It just doesn't pass muster. With much respect. It can't do much about the prior decision. Well, I think, I'm not criticizing the decision, I'm criticizing, with all respect, the counsel characterization. But I think with respect to the cross-medical case, that's really not germane to the situation here. There the court, the issue before the court was whether Medtronic was liable for making the patented invention. And the key element in that claim was operatively joined. And the court found that that was a structural limitation, operatively joined, not merely adapted to be joined, similar to the adapted to be, for additional processing in this case. So that's a different situation. And, of course, in that case, the court found that the surgeons were not under the control of Medtronic. Counsel, I'd like to move you to the prosecutor. Yes, of course. So why isn't the selection of toll calls for summary report generating a selected by user? Why isn't that done? Well, Your Honor, there were four files that the user could select. And these were the same records that the customers, the 9X customers, were receiving on 9-inch tapes. Well, there's some dispute over whether or not the records are the same. I don't think that's so clear on summary judgment. That's correct. The format of the files was different, but the records were the same. But if I assume inferences in favor of them, since this is a summary judgment context, that position doesn't work. But in any case, they had a choice among four files, long distance, local calls, other installation of equipment, and so forth. The selection of one of those files, that's a file type. It's not specifying the character of the data. The court found, the district court found in this claim construction that specified by the user means that the user selects or makes specific the character of the reports, of the record. So merely saying, well, we want the long distance calls, doesn't tell you anything about how the files should be formatted. Why even have the character of the data? It's a specific type of charge, the long distance calls. Don't send me the local calls. Don't send me the equipment use charges. Just send me this specific category of charges. Why isn't that specific enough? Well, because, Your Honor, it's simply saying I want a certain kind of file. It doesn't tell NYMEX how I want the file formatted, how the file should be arranged, what data fields should be in the file. It simply says I want long distance or I want local. But I don't understand the claim construction requiring those other things. The district court's claim construction, which you have not disputed in this appeal, is quite broad. Well, the court elaborated on that in deciding the motion for summary judgment of invalidity under 112, and it says that the claim requires user input. Under 112? But I thought we were focusing on the anticipation. That's correct. But I think the court, regardless of what the context was, the court said, clarified, in a sense, its marking and ruling. It said the claim requires input. The system incorporate user input into the character of the file. So the system has to incorporate user input. And simply saying I want local or I want long distance doesn't incorporate user input into the character of the file. Unless there are further questions, I see my red light is on. All right. Thank you, Mr. Wigman. Thank you, Your Honor. Mr. Blusko, on the cross appeal, since we gave Mr. Wigman a little more time, you can have up to five minutes on the cross appeal. Yes, Your Honor. First off, I think that Your Honor hit the nail on the head here with respect to all that was required. The claim construction, which is not challenged by either party here, was that it was select or make specific the character of, and it's the character of the preprocessed summary report. It isn't the data that's in that report specifically. Can you construe for me the claim construction? What does selecting the character of data mean? It means, well, it's not of data. It's of the report. Summary reports are a collection of data, as that term was construed separately. And it just means I want this kind of report or that kind of report to be preprocessed on the data processing mean side of the back end. And here that active limitation was met by the customer saying, I want a toll report or I want an SMDR report or an OCC report, whatever. That selection then resulted in them getting a particular type of report, one variety of another, that had everything in it prepared by the data processing means, which has these other requirements as interpreted by the court. And that was then provided to the customer, and the customer was also provided a client application, which it could adapt its computer then to, in effect, take the information that was provided, and it would be loaded into a D-base application on the customer side. So that had everything in it. Here we have the real situation, unlike in the infringement context, where we have proof of, as specified by the users, an active limitation that was met with a PC adapted for further use of that data. Both of those things together, which of course can't find any evidence of both of those things together on the infringement side, but on the invalidity side, it was there. So I think that is the key point there. And as far as this idea that there was additional claim construction done, I don't think there was any additional claim construction done by the district court. Rather, the judge applied the claim construction that was done and said, I don't find that that's here, but I think that's mistaken because of, in the first part, his belief, well, this selection wasn't done because it was already done before in connection with the pre-COBRA version. But as already pointed out, I don't think it would make any difference whether it was done before or not, but in fact the record shows it was done separately here when you signed up for this. Thank you, Mr. Felusco. We will be on a quest to find the right answers in case we take an under advisement.